UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-                               NOT FOR PUBLICATION
                                                        **MEMORANDUM & ORDER**
ROBERTO GUSTAVO CORTES RIPALDA     21-cr-458 (CBA)

                    Defendant.
-------------------------------------------------------x

**AMON, United States District Judge:**

On September 1, 2021, defendant Roberto Gustavo Cortes Ripalda ("Defendant"), along with co-defendants Ernesto Weisson ("Weisson") and Fernando Haberer ("Haberer"), was indicted and charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 ("Count One"), conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 ("Count Two") and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) ("Count Three"). (ECF Docket Entry ("D.E.") # 1 ("Indictment").) Defendant pleaded guilty pursuant to a plea agreement to Count One. (D.E. # 118.) The U.S. Probation Office, in its presentence investigation report, calculated a total offense level of 43. (D.E. # 131 ("PSR") ¶ 46.) With a criminal history category of I, this would result in a recommended range for incarceration under the Guidelines of life imprisonment but for the statutory maximum penalty of a 240-month term of imprisonment. U.S.S.G. §2B1.1(a)(1); (PSR ¶ 33.) The PSR's calculation of the offense level included a 26-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(N) based on a finding that the total loss amount was $155 million, and a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) based on a finding that Defendant was an organizer or leader of a criminal activity that involved five or more participants. (Id. ¶¶ 34, 40.) Defendant only objects to the loss amount calculation. (D.E. # 133.)

1

For the reasons set forth below, I conclude that the total loss amount is greater than $65 million, but less than $150 million, warranting a 24-point, rather than a 26-point, enhancement. As a result, I calculate a total offense level of 41.

## BACKGROUND

Defendant and Weisson founded South Bay Holdings and its related entities (collectively, "South Bay") as a Florida based real estate development business. (PSR ¶ 7.) South Bay would acquire properties, demolish them, and build and sell new luxury homes. (Id.) In 2005, Defendant and Weisson founded Biscayne Capital[1] to create an institutionalized form of financing to fund South Bay's projects. (Id. ¶ 8.) Around 2007, South Bay started experiencing serious financial difficulties exacerbated by the 2008 financial crisis. (Id. ¶ 10.) To address South Bay's cash flow issues, Defendant and Weisson created a series of private investment products ("Proprietary Products") to raise funds to support, among other things, South Bay's real estate development projects.[2] (Id. ¶¶ 10-11.) Instead of using most of the investor funds towards South Bay's real estate projects, Defendant, Weisson, and Haberer eventually used most of the money to pay outstanding interest and principal debt obligations to investors in other Proprietary Products. (Indictment ¶ 20.)

Defendant and his co-conspirators engaged in additional fraudulent activities that ultimately fueled the cash flow needs for the scheme. In 2013, Defendant created and marketed a Liquidity Note as a safe, interest generating money market account, but eventually the funds were

---

[1] Biscayne Capital was operated through a series of different entities incorporated at various times in United States, Uruguay, Bermuda, Switzerland, the British Virgin Islands, and the Bahamas. (Indictment ¶ 4.)

[2] Between 2006 and 2018, Biscayne Capital created and marketed to clients the following Proprietary Products: (1) Sentinel Investment Fund, (2) SG Strategic Income Limited, (3) GMS Global Step Up Note Limited, (4) ORC Senior Secured Limited, (5) Preferred Income Collateralized International Limited, (6) Select Industries P.L.C. and (7) Managed Index Liquidity Rate ("Liquidity Note"). (PSR ¶ 11; Indictment ¶ 8.)

entirely used to repay older investors. (D.E. ## 189, 190 ("Fatico Tr.") 39-40; 58-59.) To conceal the fraudulent scheme, Defendant directed others to provide false account statements to reflect balances or investments investors believed they had. (PSR ¶ 24; Indictment ¶ 38.) Further, in 2015, Haberer devised an overdraft scheme wherein he falsely represented to banks that Biscayne Capital had secured buyers for Proprietary Products to access short term credit from Biscayne Capital client custody bank accounts. Defendant and his co-conspirators used some of this money to repay investors in Proprietary Products. (PSR ¶¶ 17-18.)

Around December 2015, Defendant, Weisson, and Haberer made Gustavo Trujillo ("Trujillo") the nominal owner of Madison Asset LLC ("Madison"), an entity used to send and receive cash and securities invested in Biscayne Capital. (Id. ¶ 9.) Defendant and his co-conspirators maintained spreadsheets that tracked the inflow and outflow of client funds to make decisions on the use of the funds, including repaying older investors. (Indictment ¶ 28.)

In 2016, Defendant and Weisson divested Biscayne Capital into trusts and Defendant stepped down from his role as CEO. (PSR ¶ 19.) However, Defendant continued to exercise control over Biscayne Capital, including making cash flow decisions involving Madison, until the end of 2017. (Id.) In the end, the scheme collapsed when Biscayne Capital went into liquidation, resulting in over $155 million in losses to Biscayne Capital clients. (Id. ¶ 25.)

In his plea allocution, Defendant admitted to the above-described scheme, stating that:

> At certain times between 2013 and 2018 here in the Eastern District of New York, I, along with others in the indictment, agreed to devise a scheme to defraud investors by falsely representing, by way of e-mails and other electronic means, to investors of Biscayne Capital that their investments were to be used to purchase proprietary products, more specifically fund real estate investments, when in fact their investment monies were used in an illegal fashion to cover the debts owed to other investors within Biscayne Capital. I knew that what we did was not legal.

(D.E. # 164-3 ("Plea Allocution") 24:1-10.)  On March 2, 2024, Defendant objected to the PSR's loss amount calculation and requested a hearing pursuant to United States v. Fatico, 458 F. Supp. 388 (E.D.N.Y. 1978) to resolve the dispute.  Defendant submitted briefing (D.E. ## 163 ("Def. Mem."), 172 ("Def. Supp.")), and the Government responded.  (D.E. ## 164 ("Gov. Mem"), 176 ("Gov. Supp.").)

On November 21-22 and December 20, 2024, I held a Fatico hearing on the appropriate loss amount attributable to Defendant.  The Government contended that a 26-point enhancement applied because the loss exceeded $150 million but did not exceed $250 million.  Defendant contended that he was only responsible for $12.3 million, which results in a 20-point enhancement because the loss exceeded $9.5 million but did not exceed $25 million.  (Dec. 20, 2024 Fatico Tr. 25:5.)  At the Fatico hearing, the Government presented evidence that Defendant used money from numerous investors to repay other investors in Proprietary Products in furtherance of a classic Ponzi scheme.  I heard testimony from the Defendant and two witnesses: Weisson and Trujillo, who described Defendant's participation in and knowledge of decisions that furthered the fraudulent scheme.

## ANALYSIS

Section 2B1.1(b)(1) of the Guidelines defines loss as the "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1.  Calculating the loss attributable to Defendant's conduct presents challenges given the scale and nature of Defendant's fraudulent scheme.  Defendant deceived investors and moved millions of dollars through elaborate means to cover various debts.  However, in determining the loss amount, I am "not required to calculate the amount of loss with certainty or precision but 'need only make a reasonable estimate of the loss'

that is 'based on available information.'" United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015) (quoting U.S.S.G. § 2B1.1, Application Note 3(C)).

Further, I may sentence the Defendant "based on the reasonably foreseeable acts and omissions of his co-conspirators that were taken in relation to a conspiracy." United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013) (citing U.S.S.G. § 1B1.3(a)(1)(B)). To hold Defendant accountable for the acts of a co-conspirator, I must find "1) that the acts were within the scope of the [D]efendant's agreement and 2) that they were foreseeable to the [D]efendant." United States v. Johnson, 378 F.3d 230, 238 (2d Cir. 2004) (quoting United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995)). The relevant inquiry, here, is "what role the [D]efendant agreed to play in the [scheme], either by an explicit agreement or implicitly by his conduct." Studley, 47 F.3d at 575.

As an initial matter, Trujillo testified that he maintained a spreadsheet (Gov. Fatico Ex. D), that tracked the outstanding loan amounts owed to investors in Proprietary Products as of November 2017 (Fatico Tr. 193-196), and the parties do not dispute those investors lost at least $155 million when Biscayne Capital went into bankruptcy in 2018. (See Def. Mem. 37-38.) Defendant instead only objects to the conclusion that he is responsible for the full loss amount.

Defendant first argues that he is not responsible for any losses prior to 2017: he claims that he ran South Bay and Biscayne Capital consistent with legal business activity. Accordingly, Defendant argues that any investor funds raised prior to 2017 should be subtracted from his loss amount calculation because all the funds raised during this period were "legitimate." (Id. 38.) Defendant's argument is not credible. Here, Weisson testified that after a series of unsuccessful real estate investment plans made worse by the 2008 financial crisis, South Bay ran into financial difficulties. (Fatico Tr. 35-37.) To address these difficulties, Defendant and Weisson decided, in part, to raise new money through several Proprietary Products. (Id. 39:25 – 40:22.) The

5

Proprietary Products were marketed to investors as real estate investments but were eventually used to pay off previous investors in other Proprietary Products. (Id. 170.)

Contrary to his current position, Defendant admitted to this scheme in his plea allocution. Defendant stated that between 2013 and 2018, he devised a scheme to "defraud investors by falsely representing" that their investments in Proprietary Products would be used to fund "real estate investments," but instead were used to "cover the debts owed to other investors within Biscayne Capital." (Plea Allocution 24:1-10.) At the Fatico hearing, Defendant testified that his statement was correct and that he knew what he did was illegal. (Fatico Tr. 454:6-7.) I also note that Defendant did not object to the PSR's four-point enhancement for his role as a leader of the fraudulent scheme. (See PSR ¶ 40.) Defendant's position is contradictory: on one hand he does not dispute his role as a leader of the fraudulent scheme, while on the other, he claims that no illegal business activities occurred while he was in charge. Despite this inconsistency, as CEO until late 2016, Defendant surely knew that per the terms of the Proprietary Products offering memoranda with investors, using investor funds to repay older investors in other Proprietary Products violated the investment objectives of those agreements. (Fatico Tr. 43-44; 159-160, 434; see, e.g., Gov. Fatico Exs. V-009; Q-014, R-010.)

The Government provided numerous examples of Defendant directing others to use new money to cover old money. For example, in 2013, Defendant told a financial advisor to bring in new money from other clients to cover maturities on certain Proprietary Products. (Fatico Tr. 442-43; Gov. Fatico Ex. AZ.) And again in 2013, Defendant, in another email with financial advisors, clarified that "other trades" of Proprietary Products would be made to "cover" payments on maturing Proprietary Product notes. (Fatico Tr. 445; Gov. Fatico Ex. AAB.)

Further, Trujillo and Weisson testified that since at least 2013, they had weekly meetings with Defendant to discuss a "Cash Flow Spreadsheet" which managed the inflow and outflow of money for all the entities involved with Biscayne Capital and South Bay. (Fatico Tr. 73-74, 76, 168; Gov. Fatico Ex. I-1.) Defendant accessed, reviewed, and made changes to this spreadsheet using a fake name associated with a separate Google account. (Fatico Tr. 175-76.) The Cash Flow Spreadsheet, among other things, showed that client investments in Proprietary Products were used to pay back other investors in other Proprietary Products. (Id. 177.) For example, the Cash Flow Spreadsheet traced the misuse of more than $4.9 million in funds from Ferran Mirapeix. (Id. 72:3-16, 91-92; Gov. Fatico Ex. I-1.) The Government provided testimony, e-mails, and WhatsApp messages detailing Defendant's direct involvement in fraudulently misappropriating Ferran's funds, among others.

Defendant also used client funds invested in Liquidity Notes in furtherance of the Proprietary Product Ponzi scheme. Defendant marketed the Liquidity Note as a money market product where clients would have daily access to liquidity, but instead the funds were ultimately used to pay off other Proprietary Product notes. (See Gov. Fatico Ex. I-1.) Trujillo testified that money invested in Liquidity Notes eventually was "100 percent" used towards the Proprietary Products Ponzi scheme. (Fatico Tr. 211-12.) Defendant participated in and was knowledgeable of the misuse of more than $29.6 million in funds from investors in Liquidity Notes. (Id. 198-99, 212; Gov. Fatico Exs. D, AF.) For example, in 2013, Defendant told a financial advisor to "[p]ut 2.5 million" cash from client accounts into the Liquidity Note so Biscayne Capital could have more cash available to, among other things, close out other clients. (Fatico Tr. 60-61; Gov. Fatico Ex. AW-1.) And again in 2013, Defendant directed Trujillo to lie to a client, Defendant's brother-in-law, to conceal that Defendant had ordered the purchase of $350,000 into a Liquidity Note

7

without the client's knowledge. (Fatico Tr. 324-25; Gov. Fatico Ex. AQ.) Last, Defendant took deliberate, sophisticated steps to further and conceal Biscayne Capital's fraud: directing Trujillo on several occasions to send fake account statements to several investors. (Fatico Tr. 248-50, 313; Gov. Fatico Exs. AS, AT, AT-1, AAC, AAC-1.)

Defendant also disputes the extent of his participation in Biscayne Capital's fraudulent scheme post-2017 after he stepped down as CEO: he claims he could not reasonably foresee the losses involving the "rogue" actions of his co-conspirators. Defendant argues that funds raised from new money investors after 2017 brought in for his co-conspirators' own self-dealings should be subtracted from his loss amount calculation. (Def. Mem. 38.) However, I find that Defendant remained an active participant in the fraudulent scheme. Therefore, most of his co-conspirators' fraudulent activities were reasonably foreseeable, known by Defendant, and within the scope of the activity agreed upon.

Here, Weisson testified that after Defendant stepped down as CEO in 2016, Defendant continued to exercise substantial decision-making authority as a consultant to the trusts. (Fatico Tr. 93.) Defendant, by contrast, testified that in 2017, Weisson, Trujillo, and Haberer "took things into their own hands" and were "in complete control" of Madison and Biscayne Capital. (Id. 382.) Defendant characterized his continued involvement as merely having "a little foot in the door" because he was "very concerned" things were "being managed in a rogue way." (Id. 385-86.) However, the evidence supports finding that Defendant remained involved in the decisions that furthered the Ponzi scheme.[3]

---

[3] I find, and the Government concedes, that Defendant is not responsible for Weisson's $16 million investment in Villa Hermosa funded by investor funds in Proprietary Products (Fatico Tr. 132-134, 267-69) and the $8 million that Haberer raised from a Mexican client. (Id. 279-80.) Accordingly, I will not attribute these and similar transactions where Defendant could not have reasonably foreseen certain self-dealing transactions.

For instance, between April 2016 and November 2017, Defendant created and participated in a WhatsApp Chat ("Flux Chat") with Weisson, Trujillo, and Haberer that discussed Biscayne Capital's and Madison's inflows and outflows of cash, including using new investor money to pay older investors. (Id. 187-88.) For example, in May 2017, Defendant informed the group that "[t]omorrow we urgently need 75K, and 75K at the end of next week . . . That's why I sent cash flows." (Gov. Fatico Ex. H-1 41.) And in June 2017, in an effort to help stall a client's requests for payment, Defendant updated the group that he told the client "not to worry" because "the payment should arrive." (Id. 53-54.) And although Defendant may not have been involved in the exact details of how some of the new investor money came in, the money was reflected in the Cash Flow Spreadsheet, available to and used by Defendant and his co-conspirators.[4] (Fatico Tr. 327-28.)

This evidence establishes that the Defendant actively participated in deciding who and what to pay, an integral part of keeping the Proprietary Product Ponzi scheme afloat. Defendant was "instrumental" in "creat[ing] the Ponzi scheme" surrounding the Proprietary Products, and "continued to participate in . . . the scheme" until it collapsed. See United States v. Eisner, 431 F. App'x 23, 26 (2d Cir. 2011) (affirming the district court's finding that the actions of the defendant's co-conspirator in furtherance of a Ponzi scheme were within the scope of the defendant's agreement) (summary order). Accordingly, I find that the evidence presented at the Fatico hearing clearly establishes that the reasonably foreseeable loss that resulted from

---

[4] Defendant further admitted that despite his co-conspirators informing him of certain actions to further the fraudulent scheme, he did not "come forward" to "stop it." (Dec. 20, 2024 Fatico Tr. 39:4.)

Defendant's fraudulent conduct conservatively exceeds $65 million, resulting in a 24-point enhancement.[5]

## CONCLUSION

For the foregoing reasons, a 24-point enhancement for loss greater than $65 million but less than $150 million is warranted. I find that the Defendant's total offense level is 41. With a criminal history category of I, this would result in a recommended range for incarceration under the Guidelines of 324 to 405 months but for the 240-month statutory maximum penalty, which results in an advisory Guidelines sentence of 240 months' imprisonment.

SO ORDERED.

Dated: January 22, 2025
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

---

[5] I note in passing that even if I did not find Defendant responsible for the full duration and scope of the fraud, the Government has provided evidence of Defendant's direct involvement in fraudulently misappropriating more than $25 million between 2013 and 2018. The Defendant concedes that he was responsible for the misuse of $7 million in funds from Westwood (Fatico Tr. 240, 246, Dec. 20, 2024 Fatico Tr. 25:1-2); $300,000 in funds from his father-in-law (Dec. 20, 2024 Fatico Tr. 25:3-4); and $5 million in funds associated with the Liquidity Note scheme. (Id. 25:2-3.) In addition, I find that Defendant played an active role in the misuse of $4.9 million in funds from Ferran Mirapeix (Fatico Tr. 72:3-16, 91-92); and despite Defendant's contention, more than $29.8 million in funds associated with the Liquidity Note. Together, these funds alone total $42 million, resulting in a recommended Guidelines range of 262 to 327 months' imprisonment, well above the statutory maximum of 240 months.